**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**UNITED STATES OF AMERICA,**

**v.**                                    **CRIMINAL NO. 2:07cr153**

**STEVE VANKESTEREN,**

          **Defendant.**

**DEFENDANT'S STATEMENT OF ISSUES**
**APPEALED AND MEMORANDUM IN SUPPORT THEREOF**

          COMES NOW the defendant, Steven Vankesteren, through counsel, and, in response to

this Court's Order of August 22, 2007, hereby files his Statement of Issues Appealed and

Memorandum in Support Thereof.  Defendant respectfully requests that this Court reverse his

convictions for taking or possessing a migratory bird without a permit, in violation of 16 U.S.C.

Sec. 703 and 50 C.F.R. Sec. 21.11.  In support of this request, defendant states as follows:

**BACKGROUND**

          Steve Vankesteren was charged in this Court with taking or possessing a migratory bird

without a permit, to-wit, a red-tailed hawk, on January 17, 2007 and January 20, 2007, violation

numbers W0784083 and W0784084.  Mr. Vankesteren appeared for trial, *pro se*, before the

Honorable F. Bradford Stillman, United States Magistrate Judge, on August 7, 2007.  Mr.

Vankesteren challenged the legality of the search, arguing that the Government had violated his

rights under the Fourth Amendment by setting up video surveillance on Mr. Vankesteren's

property.  Mr. Vankesteren noted that the property is a mile from his house at the corner of his

farm, and that this is one of the most private fields he owned.  (Transcript August 7, 2007, p. 7).

1

When Mr. Vankesteren is out working on this area of the farm, he goes to the bathroom, and

expects that there is no one watching or video taping him in his actions.  *Id.*  The field cannot be

seen from the road as it is protected by a hedgerow.  (Tr. 69).  Judge Stillman took the

suppression motion under advisement and heard the evidence in the case.

The evidence revealed that Mr. Vankesteren, a farmer on the Eastern Shore of Virginia,

set out traps on his property in order to catch predators such as raccoons, foxes, and possums

which had been disturbing his crops.  Steven Garvis, a Virginia game warden or conservation

officer with the Department of Game and Inland Fisheries (Tr. 25), received a call about a

strange trap and cage with a bird in it on property leased by Mr. Vankesteren.  (Tr. 26).  Mr.

Garvis traveled upon Mr. Vankesteren's property to investigate.  Mr. Garvis did not speak with

Mr. Vankesteren about the traps, despite the fact that he knew Mr. Vankesteren, but rather

arranged to place a video surveillance camera on Mr. Vankesteren's property. (Tr. 31).  Mr.

Garvis did not obtain a warrant before arranging for the video surveillance.   As recorded by the

video camera, on January17, a bird was killed.  (Tr. 62).  Agent Garvis could not, with certainty,

identify it as a red-tailed hawk.  He narrowed it down to a Red-tailed hawk, a broadwing hawk,

or a red-shouldered hawk.  (Tr. 62).  The videotape for January 20 showed that Mr. Vankesteren

dispatched a bird with an ax, and Mr. Garvis identified that bird as a red-tailed hawk.  (Tr. 63).

When asked about the red-tailed hawk and its protected status under the Migratory Bird

Act, Mr. Garvis responded as follows:

Q: And are they migratory – how do you know that they are migratory game birds?

A: They are listed – well, I don't know if they are listed specifically by species under the

Migratory Bird Act.  I believe they are.  However, they are a migratory bird that does migrate

2

down the eastern seaboard, particularly staging on the Eastern Shore before they cross the bay.

Oftentimes they do migrate to the Eastern Shore and stay there for the winter.

(Tr. 37).

Agent Daniel Rolince, special agent with the United States Fish & Wildlife Service, testified that red-tailed hawks are migratory birds that are specifically listed under Title 50 of the Code of Federal Regulations by name as protected. (Tr. 102). However, Agent Rolince did not identify the specific code section, did not indicate whether or not the broadwing hawk and the red-shouldered hawk were specifically listed in the Code of Federal Regulations, and did not produce a copy of the regulation for the Court.

Mr. Vankesteren testified that he set out the traps to catch predators on his property. When he discovered the severely injured birds, he removed the birds from the trap, then killed the birds to end their suffering. Mr. Vankesteren did not intend to trap the birds, and has since switched to a different type of trap, and has further obtained a permit to hunt a limited number of red tailed hawks. Mr. Vankesteren has made great efforts to preserve the property along the Eastern Shore by planting hedgerows, attracting birds to the area, and removing dangerous predators. He has been given conservation awards for his efforts.

Judge Stillman, after hearing the evidence, denied the motion to suppress, and found Mr. Vankesteren guilty of both offenses. Judge Stillman concluded that these were knowing violations by Mr. Vankesteren. (Tr. 140). Judge Stillman imposed a $500 fine on each count, along with a $10 special assessment and $25 processing fee. Mr. Vankesteren filed a timely notice of appeal from Judge Stillman's decision.

## STATEMENT OF ISSUES

1. Did Judge Stillman err in denying the Motion to Suppress?

2. Was the evidence sufficient to convict Mr. Vankesteren of the offenses charged?

## ARGUMENT

## 1.  Judge Stillman erred in denying the Motion to Suppress.

Mr. Vankesteren moved to suppress the video tape which the Government had obtained through the use of a hidden video camera on the property leased by Mr. Vankesteren.  He argued that the use of the video camera, on his private property, violated his rights under the Fourth Amendment.  Judge Stillman, after taking the motion under advisement, denied the motion to suppress and permitted the Government to enter the video tape into evidence.

The Fourth Amendment to the United States Constitution provides that the right of the people to be secure in their persons, houses, papers and effect, against unreasonable searches and seizures, shall not be violated.  In *Hester v. United States*, 265 U.S. 57, 59 (1924), the United States Supreme Court held that the Fourth Amendment's protection accorded "person, houses, papers and effects" does not extend to open fields.  The Court employed the concept of curtilage, and observed that the distinction between a person's house and open fields is as old as the common law.

The Supreme Court reaffirmed this holding in *Oliver v. United States*, 466 U.S. 1970 (1984), recognizing that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.  466 U.S. at 180.  The Court identified the central component of this inquiry as whether the area harbors the "intimate

4

activity associated with the 'sanctity of a man's home and the privacies of life.'". *Id.* (Emphasis added).

More recently, in *United States v. Dunn*, 480 U.S. 294, 301 (1987), the Supreme Court stated that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. *Id.* However, the Court noted that these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration – whether the area in question is so intimately tied to the home itself that is should be placed under the home's "umbrella" of Fourth Amendment protection. *Id.*

Significantly, none of these decision by the United States Supreme Court involving the open fields doctrine also involved the placement of a hidden video camera, without a warrant, on the private property of the defendant. The Supreme Court cases have either involved aerial surveillance, or "plan view" observation, but not a hidden video camera. A hidden video camera, placed on the property to observe all movement, is significantly different than an aerial surveillance of the property, or plain view observation of the property. As noted by other courts, hidden video surveillance invokes images of the "Orwellian state" and is regarded by society as more egregious than other kinds of intrusions. *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987). Video surveillance can result in extraordinarily serious intrusions into personal privacy. If such intrusions are permissible, they must be justified by an extraordinary showing of need. *United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir. 1992) (Kozinski, J.,

concurring).  Hidden video surveillance is one of the most intrusive investigative mechanisms available to law enforcement.  The sweeping, indiscriminate manner in which video surveillance can intrude upon us, regardless of where we are, dictates that its use be approved only in limited circumstances.  *United States v. Nerber*, 222 F.3d 597 (9th Cir. 2000).  This difference between video surveillance and aerial surveillance, or personal observation, is significant in the Fourth Amendment context.  Mr. Vankesteren had a right under the Fourth Amendment to be free from video surveillance on this private property, where he engaged in private, intimate, and personal activities.

The Government relied heavily upon the Ninth Circuit case of *United States v. McIver*, 186 F.3d 1119 (9th Cir. 1999) before Judge Stillman to support its position that the video surveillance of Mr. Vankesteren's property did not violate his rights under the Fourth Amendment.  The *McIver* case involved a patch of marijuana which the defendants were growing on <u>public land in a national forest</u>.  A video surveillance was set up by the government.  However, it was not private land, but land actually belonging to the federal government.  The Ninth Circuit found that the defendants did not have an expectation of privacy on this public land and that the video surveillance did not violate their rights under the Fourth Amendment.  Significantly, the *McIver* court noted that its holding on this issue was quite narrow.

The *McIver* case is significantly different from Mr. Vankesteren's case and cannot be used as precedent to establish the legality of the video surveillance.  The land in question in Mr. Vankesteren's case was private property.  The land with the traps was not part of a national forest.  The legality of the search in Mr. Vankesteren's case cannot be resolved by reference to the *McIver* case.

6

The property in question in this case does not fall within the "open fields" doctrine, but rather is an area in which Mr. Vankesteren had a reasonable expectation of privacy. This area was entitled to Fourth Amendment protection, and the motion to suppress should have been granted. The burden of proof was on the Government to demonstrate that the warrantless search in this case was reasonable. The evidence presented by the Government did not show that the search was reasonable. First, the Government failed to clearly establish the proxmtiy of this field to Mr. Vankesteren's home, the manner in which this field was used, and this field's visibility to others. The evidence did not demonstrate that this area was not within the "curtilage" of Mr. Vankesteren's home. Although the property was a short distance from the home, Mr. Vankesteren's testimony indicated that he engaged in "intimate activity associated with the sanctity of a man's home and the privacies of life" when he was on the property. Furthermore, Mr. Vankesteren had taken steps to protect the area from observation. The fields were not open to view from the road because of the hedgerows. This area should have been placed under the home's "umbrella" of Fourth Amendment protection.

Furthermore, this surveillance, without a warrant, was prohibited by the provisions of the Omnibus Crime Control and Safe Streets Act of 1968 and the Electronic Communications Privacy Act of 1986, 18 U.S.C. Secs. 2510-2522. This Act prohibits the interception of certain communications by the Government without a warrant. The use of the hidden video camera without a warrant violated this Act.[1]

---

[1]. Some courts have held that this Act has no application to silent video surveillance. *See, e.g., United States v. Torres*, 751 F.2d 875, 880 (7th Cir. 1984). In this case, however, there was no testimony that this was a silent camera, and if wire, oral or electronic communications were intercepted, then the provisions of the Act apply, and the Government was required to obtain a warrant before placing the camera and intercepting the communications.

Even if this Court determines that this is an "open field", the Government has not provided any authority to support its position that the placement of a video camera, on private property, without a warrant, is proper under the Fourth Amendment. As noted above, the Ninth Circuit case is not helpful, because the land in question already belonged to the Government, not to a private citizen.. None of the cases from the United State Supreme Court involved video surveillance on private property. A video camera records intimate activities and private actions taken by citizens on their property. This is different from an aerial surveillance from an airplane in which marijuana plants are observed, and different from an individual standing at the side of the filed observing the activities. The use of a video camera, hidden in the hedgerow, was an invasion of Mr. Vankesteren's privacy, and a violation of his rights under the Fourth Amendment. Judge Stillman erred in denying the Motion to Suppress. The suppression motion should have been granted, and the charges against Mr. Vankesteren should have been dismissed.

**2.  The evidence was not sufficient to convict Mr. Vankesteren of two violations of possession of a migratory bird without a permit, to-wit, a red-tailed hawk, in violation of 16 U.S.C. Sec. 703.**

The due process clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364 (1970). 16 U.S.C. Sec. 703, Taking, killing, or possessing migratory birds unlawful, provides, in pertinent part:

(A) In general

Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to ... take, ... [or] kill, ... any migratory bird ... included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds .....

8

16 U.S.C. Sec. 703.

Pursuant to this section, the Government was required to prove that Mr. Vankesteren took or killed two migratory birds included in the terms of the convention between the United States and Great Britain. The Government's evidence failed to rise to this level. Agent Garvis testified that he was only sure that one of the birds seen on the video tape, the bird killed on January 20, was a red-tailed hawk. The other bird, killed on January 17, might have been a broadwing hawk or a red-shouldered hawk. The violation notice for the January 17 offense charges Mr. Vankesteren with killing a red-tailed hawk. There is no violation charging the killing of a broadwing hawk or a red-shouldered hawk. The Government failed to prove beyond a reasonable doubt all of the elements of the crime charged with regard to the January 17 violation, as the evidence did not show beyond a reasonable doubt that the bird in question was a red tailed hawk. Therefore, the evidence was insufficient to show that Mr. Vankesteren committed the offense charged on January 17 and the conviction on that charge must be reversed.

Furthermore, the Government failed to prove, beyond a reasonable doubt, that the red-tailed hawk is a migratory bird protected by the Migratory Bird Treaty Act. Agent Garvis testified they he was not sure if the red tailed hawk is listed specifically by species under the Migratory Bird Act. (Tr. 37). Agent Rolince testified that the red tailed hawks are specifically listed under Title 50 of the Code of Federal Regulations by name as protected. (Tr. 102). However, Agent Rolince did not refer to a specific part and section of the Code of Federal Regulations. The regulation itself was never presented to the Court. Agent Rolince was neither qualified as an expert in bird identification nor in identification of protected migratory birds. The evidence, therefore, failed to prove beyond a reasonable doubt that the red tailed hawk is a bird

9

protected under the Migratory Bird Treaty Act, and the convictions must be reversed.

Finally, the Government informed the Court that in order to be convicted of these offenses, Mr. Vankesteren's taking of the animals must be knowing and intentional. (Tr. 131). The Government suggested that there was no recognized defense involving inadvertence. *Id.* The Court found that Mr. Vankesteren's taking of the birds was knowing and intentional. (Tr. 140). This was error, as the Government failed to prove beyond a reasonable doubt that Mr. Vankesteren's taking and possessing of the red-tailed hawks was not inadvertent, and that he had the requisite intent to commit the crime.

16 U.S.C. Sec. 703 is silent on the question of *mens rea*. The statute does not state whether or not this is a strict liabilty crime, or if proof of scienter is required. As noted by the United States Supreme Court in *United States v. United States Gypsum Company*, 438 U.S. 422, 438 (1978), certainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement. The requirement of *mens rea* as predicate to criminal liabilty is a fundamental precept of the Anglo-American common law. As Justice Jackson observed in *Morissette v. Untied States*, 342 U.S. 246, 250 (1952):

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the moral individual to choose between good and evil.

*Id.*

Similarly, commentators have noted that the absence of words in the statute requiring a certain mental state does not warrant the assumption that the legislature intended to impose strict

liability.  *See* 1 W. LaFave & A. Scott, *Substantive Criminal Law,* Sec. 5.1 at 579 (1986).

In *United States v. Delahoussaye*, 573 F.2d 910 (5th Cir. 1978), the defendants were convicted of duck hunting in violation of federal regulations promulgated pursuant to the Migratory Bird Treaty Act, 16 U.S.C. Sec. 703.  The regulations prohibited the shooting of migratory game birds over a baited field.  Reasoning that hunters might innocently violate these regulations by hunting over a field without knowledge that it was baited, the Fifth Circuit held that a minimum form of scienter-the 'should have known' form is a necessary element of the offense.  *Id.* at 912.  Any other interpretation would simply render criminal conviction an unavoidable occasional consequence of duck hunting.  *Id.*  The Fifth Circuit affirmed this holding in *United States v. Garrett*, 984 F.2d 1402, 1410 n. 17 (5th Cir. 1993).

The United States Court of Appeals for the Fourth Circuit has not specifically ruled whether this violation of the Migratory Bird Treaty Act, the taking of birds protected by the Act, requires proof of some form of scienter.  In *United States v. Boynton*, 63 F.3d 337, 344 (4th Cir. 1995), the Fourth Circuit ruled that a misdemeanor prosecution for duck hunting over a baited filed is a strict liability prosecution.  Defendant respectfully suggests that the *Boynton* case is not dispositive of the issue in his case.  Mr. Vankesteren is charged with taking and killing protected migratory birds, rather than hunting over a baited field.  The Government in this case stated that the violation must be knowing and intentional.  The evidence in this case showed that Mr. Vankesteren's actions in taking the red tailed hawks were inadvertent.  The evidence was clear that Mr. Vankesteren was not attempting to trap red tailed hawks, but wanted to trap predators, such as raccoons, foxes and possums, which were destroying his crops.  Mr. Vankesteren testified that he was aware of the value of red tailed hawks, and that under his care of the habitat

11

and land, the number of red tailed hawks on his property and on the Eastern Shore has significantly increased. Mr. Vankesteren was not aware of the danger of these traps in catching other animals besides the predators he was targeting. The testimony revealed that these traps were not illegal, and neither Agent Garvis, nor any of the other agents, ever approached Mr. Vankesteren when they initially saw the traps and informed him that there was a high likelihood that he would catch protected migratory birds in the traps.

Mr. Vankesteren's violation of the statute was not knowing. He inadvertently caught the birds in the traps he had set out for predators. The traps were legal. Mr. Vankesteren mistakenly caught the birds in the traps, and once he discovered the birds, they were so severely injured that he determined the most humane course of action would be to kill the birds, rather than prolong their suffering. As noted by Justice Jackson in *Morissette v. United States, supra*, the contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. The injury inflicted in this case was inadvertent, and was not inflicted by intention. Therefore, a conviction under these facts would violate Mr. Vankesteren's right to due process of law, as the requirement of *mens rea* as predicate to criminal liabilty is a fundamental precept of the Anglo-American common law.

Due process of law requires that the Government prove every element of the crime charged beyond a reasonable doubt. The Government failed to prove every element of the crimes charged in this case, and the convictions for these offenses violate Mr. Vankesteren's right to due process of law. The convictions must be reversed.

12

## CONCLUSION

The placement of the video surveillance camera, without a warrant, on Mr. Vankesteren's private property, violated Mr. Vankesteren's rights under the Fourth Amendment to be free from unreasonable searches and seizures.  The Magistrate Judge erred in denying the motion to suppress, and the convictions must be reversed.  Furthermore, even if the placement of the video camera did not violate Mr. Vankesteren's rights, the Government failed to prove every element of the crimes charged beyond a reasonable doubt, and the convictions for these offenses violate Mr. Vankesteren's rights under the due process clause.  Therefore, the convictions must be reversed.

WHEREFORE, defendant respectfully requests that this Court reverse his convictions for taking and possessing a migratory bird, to-wit, a red tailed hawk, in violation of 16 U.S.C. Sec. 703(a).

Respectfully submitted,

STEVEN VANKESTEREN

/s/
James O. Broccoletti
Virginia State Bar No.: 17869
Attorney for Defendant, STEVEN VANKESTEREN
**ZOBY & BROCCOLETTI, P.C.**
6663 Stoney Point South Norfolk, VA 23502
(757) 466-0750
(757) 466-5026
 james@zobybroccoletti.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 24, 2007, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF filing system which will send the notification of such filing

to Dee Sterling, Assistant United States Attorney, Office of the United States Attorney.


/s/ James O. Broccoletti      

14